UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANNETTA D. HODGES                                CIVIL ACTION

VERSUS                                           NO. 14-2896

CAROLYN W. COLVIN, ACTING                        SECTION "E" (2)
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

Plaintiff, Annetta D. Hodges, seeks judicial review pursuant to Section 405(g) of

the Social Security Act (the "Act") of the final decision of the Commissioner of the

Social Security Administration ("Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") and supplemental security income benefits ("SSI") under

Titles II and XVI of the Act.  42 U.S.C. §§ 423, 1382c.  This matter was referred to a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.       PROCEDURAL HISTORY

Hodges filed her applications for DIB and SSI on June 8, 2012, alleging disability

beginning December 30, 2011 due to sarcoidosis,[1] high blood pressure, asthma, anxiety,

---

[1]Sarcoidosis
is a disorder resulting in noncaseating granulomas in one or more organs and tissues;
etiology is unknown.  The lungs and lymphatic system are most often affected, but
sarcoidosis may affect any organ.  Pulmonary symptoms range from none to exertional
dyspnea and, rarely, lung or other organ failure.  Diagnosis usually is first suspected
because of pulmonary involvement and is confirmed by chest x-ray, biopsy, and
exclusion of other causes of granulomatous inflammation.
Merck Manual Professional Version (rev. March 2014 by Michael C. Iannuzzi, M.D., & Birendra P. Sah,
M.D.), http://www.merckmanuals.com/professional/pulmonary-disorders/sarcoidosis/sarcoidosis (visited
Sept. 28, 2015).  "Noncaseating" means "not exhibiting caseation."  MedlinePlus Medical Dictionary
(Merriam-Webster,  Inc.  2015),  http://www.merriam-webster.com/medlineplus/Noncaseating%20.

arthritis, left arm problems, hypothyroid[2] and "fluid." (Tr. 134-43, 155). After her

claims were denied at the agency level, she requested a hearing before an Administrative

Law Judge ("ALJ"), which was held on August 13, 2013. (Tr. 28-70). The ALJ issued

a decision denying the applications on November 13, 2013. (Tr. 12-23). After the

Appeals Council denied review on October 29, 2014, the ALJ's decision became the

Commissioner's final decision for purposes of this court's review. (Tr. 1-3).

Plaintiff filed a timely memorandum in support of her appeal. Record Doc.

No. 12. Defendant filed a timely reply memorandum. Record Doc. No. 13.

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ adopted the residual functional capacity assessment of a non-examining physician who did not review the entire record and failed to evaluate the separate opinions of plaintiff's treating specialist, Carl M. Gauthier, Jr., M.D., as required by 20 C.F.R. § 404.1527(c).

B.    The ALJ found that Hodges has a limitation in reaching with her right arm, but failed to recognize that she has limitations in the use of both of her hands and arms.

C.    Substantial evidence does not support the ALJ's adverse credibility finding and the resulting residual functional capacity assessment.

---

Caseation is "necrosis with conversion of damaged tissue into a soft cheesy substance." Id., http://www.merriam-webster.com/medlineplus/caseation%20. A granuloma is "a mass or nodule of chronically inflamed tissue with granulations that is usually associated with an infective process." Id., http://www.merriam-webster.com/medlineplus/Granulomas%20.

[2]Hypothroidism is "deficient activity of the thyroid gland; also: a resultant bodily condition characterized by lowered metabolic rate and general loss of vigor." Id., http://www.merriam-webster.com/medlineplus/hypothyroidism.

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

1.   Plaintiff has severe impairments consisting of asthma, sarcoidosis, morbid obesity, degenerative disc disease of the cervical and lumbar spines, hypertension and hyperthyroidism.[3]

2.   Hodges has the residual functional capacity to perform sedentary work except that she can stand and/or walk for only two hours and sit for six hours in an eight-hour day; cannot climb ladders, ropes or scaffolds, or kneel, crouch or crawl; can occasionally climb ramps or stairs, balance and stoop; cannot reach above shoulder level with her right, non-dominant arm; and must avoid concentrated exposure to pulmonary irritants.

3.   Her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.  However, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

4.   Plaintiff cannot perform her past relevant work as a certified nursing assistant and fast food worker.

5.   Considering her age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that Hodges can perform, including assembler, production worker helper and inspector.

6.   Hodges has not been under a disability from December 30, 2011, through the date of the ALJ's decision.

(Tr. 14-23).

---

[3]Hyperthyroidism is "excessive functional activity of the thyroid gland; also: the resulting condition marked especially by increased metabolic rate, enlargement of the thyroid gland, rapid heart rate, and high blood pressure."  <u>Id.</u>, http://www.merriam-webster.com/medlineplus/hyperthyroidism.

IV.    ANALYSIS

    A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[4] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2012).  The regulations include a five-step evaluation process for determining whether an impairment prevents

---

[4]The relevant law and regulations governing claims for DIB and SSI are identical.  Carmon v. Barnhart, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)); Baltierra v. Chater, 70 F.3d 1268, 1995 WL 696740, at *1 (5th Cir. Oct. 19, 1995) (citing Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989)); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *1 (5th Cir. Apr. 5, 2001) (citing Haywood, 888 F.2d at 1467).

a person from engaging in any substantial gainful activity.[5]  Id. §§ 404.1520, 416.920;

Alexander v. Astrue, 412 F.  App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue,

501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461.  The five-step inquiry

terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If

she successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

---

[5]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Plaintiff testified that she is 42 years old, finished the eighth grade and completed vocational training to be a certified nursing assistant.  She said that she was a licensed certified nursing assistant until 2008, when she let her license lapse after an unspecified event happened to her.[6]  (Tr. 34).  She has not worked since December 30, 2011.

Hodges believes she cannot work because she cannot work outdoors or "be overly active" and because no job would allow her to lie down to ease her pain when necessary. She stated that many of her prior jobs did not allow her to sit down except during regular break time and that it was a struggle for her to work then.  (Tr. 35).  She said she cannot be around chemicals because they trigger her asthma, but she cannot tell employers that they cannot use chemicals in their place of business.  She testified that nothing is easy

_____

[6]The medical records indicate that Hodges was assaulted and injured in 2008.

7

for her because she has to cope with pain.  She said she could only perform a job that allows her to lie down because she does not like to use other types of treatment to relieve pain, which do not work anyway.

Plaintiff stated that she cannot sit for very long before her ankles swell and hurt and then her back hurts and she must lie down.  She said she cannot lift 10 pounds. When the ALJ stated that plaintiff's MRI reveals only mild changes, she testified that the MRI does not reflect the pain she endures.  She stated that she cannot walk in a store without having to bend over because pain hits her and sweat pours out of her.  (Tr. 37).

Hodges testified that she lives in a trailer in Independence, Louisiana, with her 11-year-old son and 18-year-old daughter, both of whom have special needs and receive disability benefits.  She said her son has attention deficit hyperactivity disorder and oppositional defiant disorder.  She stated that her daughter's diagnosis was changed when her daughter was recently released from Southeast Hospital, but that her daughter has behavior issues with emotional developmental delay, mild mental retardation and conduct disorder, and was just diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder.  She said her daughter just came to live with her after being in Southeast Hospital and then a group home in Alexandria, Louisiana.  (Tr. 38-39).

Hodges stated that, on a typical day, she gets up in the morning, uses the bathroom and goes back to bed, then gets up again and has something to eat.  She said she cannot stand over a stove for long or, if she does cook, she sits in a chair by the stove to ensure

that nothing burns.  (Tr. 39).  She testified that either she cooks for her children, the children make something for themselves in the microwave or they eat out.  She said she does the laundry with her son's help.

Plaintiff stated that she uses a lot of disposable dishes because she has difficulty standing up to wash dishes.  She testified that she has had back problems since age 12.  She said that washing dishes, especially scrubbing pots, has always caused problems in her back and that she used to sit and wash pots quickly.  (Tr. 40).  When the ALJ asked her what had changed since she was able to work for years as a certified nursing assistant with long-term back problems, Hodges responded that it was always a struggle to work at that job, but she had no choice.  She stated that her back condition has worsened.  (Tr. 41).  She testified that she can wash dishes and pots as long as there are just a few, and that her son helps her.  She said she can sweep the floor for as long as she can stand it and then lies down, and her son finishes for her.  She stated that she does not mop.  She said that people call her lazy, which she denied, and that the pain is too much to bear.

Hodges testified that she alternates sitting, standing and lying down.  She said she tries not to lie down because her doctor told her after the last MRI of her neck that she might be locked into a position if she stays in that position.  She stated that her doctor told her to keep moving.  Plaintiff said she asked her doctor why she could not raise her arms overhead and her doctor told her that the MRI showed that she would lock up if she did not keep moving.

Hodges testified that she drives about a mile from her house to the grocery store. She said she drives on the interstate highway to see her doctor, but it is uncomfortable. (Tr. 44-45).  She stated that she uses a riding cart to shop for groceries and can pick up things like cereal and bread, but her son gets things that she cannot reach from a sitting position or cannot lift because of problems with her arm and hands.  She said her son picks up a case of drinks or a gallon of milk.

Plaintiff stated that she is left-handed and has difficulty reaching above shoulder level with her right arm.   (Tr. 45-46).   She said she alternates between watching television and using her home computer to look at the internet.  She testified that she is five feet nine inches tall and weighs 370 pounds.

Hodges stated that she has trouble gripping objects because her fingers lock up and that her toes also contract and cause pain.  (Tr. 47-48).  She said Dr. Gauthier told her that these problems might be caused by her arthritis or rheumatoid arthritis.  When the ALJ pointed out that the medical records contain no diagnosis of rheumatoid arthritis, plaintiff said Dr. Gauthier told her that she could have both types of arthritis as a result of her sarcoidosis and the fluid caused by that disease.  (Tr. 48).  She stated that she had more problems with "this [unspecified] hand" and that she asked Dr. Gauthier whether it could be the result of nerves in her arms being cut when she was attacked in 2008.  She testified that she lost sensation and had contraction in two of her fingers, which affected

her grip, as a result of the attack.  She said she can button a blouse, pull up a zipper and turn a doorknob.  (Tr. 49).

Plaintiff testified that she can sit for 20 minutes before she has to stand, but that sometimes she can force herself to endure the pain when she does not feel like standing. She said she can stand for 15 to 20 minutes before she starts feeling it in her ankles and has to sit down.  She stated that five pounds is the most she can lift and carry across the room.  (Tr. 50).  She testified that she can lift a gallon of milk, but it hurts to do so.  She said she uses an inhaler and does not need a cane to walk.

Upon examination by her attorney, who noted that Hodges weighed about 300 pounds when she was diagnosed with sarcoidosis the previous year, plaintiff testified that she had gained a lot of weight since then because she is on prednisone.  (Tr. 51).  She said her endocrinologist, Dr. Chava, explained to her that the medication he prescribed would also cause weight gain, but she needed to take it.  She stated that she feels pressure from the weight when she puts on clothes that no longer fit and that the excess weight also causes a little more pain.  (Tr. 52).

Plaintiff's attorney observed that Hodges kept clearing her throat during the hearing.  (Tr. 52).  Hodges testified that she told Dr. McKay[7] about the hoarseness after she had it for about three months and he said that she needed to have a test done by an

---

[7]According to the medical records, plaintiff's primary care provider, Kelisia McKay, is a Nurse Practitioner.

ear, nose and throat doctor, but she has not seen one.  She stated that she was going to have her gastroenterologist check it out because she lost her voice for three months and she was afraid she would lose it again.  She said it is hard to see any specialists near her home "with the card that I have."  (Tr. 53).

Hodges stated that she has constant abdominal pain, usually on the left but sometimes on the right, which her doctor said was caused by sarcoidosis in her spleen. She testified that the pain was never intermittent and was always consistent, but she just ignored it until it worsened.

Plaintiff stated that she had anxiety, but did not know it, until it worsened and she thought she was having a heart attack.  She said that, before that day, "it" would start in her neck, she would stand still for about three minutes, and "it" went away.  She testified that, on this particular day, she felt "it" sharply over her heart and "it" did not go away. She said she called her doctor and was told that she had anxiety.  She stated that she takes medication for anxiety, which keeps her symptoms under control.  (Tr. 55-56).

Hodges said that her nebulizer and her inactivity prevent her from having asthma attacks.  (Tr. 56-57).  She stated that she uses her nebulizer if she engages in too much activity, but she only has to take two or three puffs to counteract the attack, instead of using it every six hours as prescribed.

Plaintiff testified that she typically gets up in the morning to get her children ready for and/or drive them to school, then lies down for a while before getting up again to eat,

take her medicine and lie down again.  (Tr. 57-58).   She said she visits her sister for a few minutes a day and then lies down.  She stated that she stopped going to church initially because she did not have transportation, but now does not go because she cannot sit on the hard benches.  (Tr. 58).

When the ALJ asked Hodges whether her doctors have told her to move around and keep active, plaintiff said her doctor told her that she "would lock up" if she does not keep moving and that other doctors have told her to lose weight or she is "headed for the wheelchair."  She testified that she has no control over her weight.  (Tr. 59).

Plaintiff stated that the school calls occasionally about her son acting up.  She said that either she goes to the school to deal with it or a close friend who works at the school handles the problem for her.  (Tr. 59-60).  She said that her daughter had just started school that day after returning home from the hospital and that her daughter had been in state custody since 2009 or 2010 until two months ago, but her son has lived with her since before her alleged onset date of disability.  (Tr. 60-61).  She testified that she does not go to parent-teacher conferences because school personnel talk to her on the phone.  She stated that she helps her son with his homework if he asks and that he does not participate in any school activities.  She said she takes medication for anxiety, but receives no other mental health treatment.  (Tr. 62).

Hodges clarified that she does not take naps during the day, but has to lie down after she has been sitting for 20 minutes.  (Tr. 65).  She said she lies down every hour for

15 to 20 minutes because she does not like to take pain medication or any medication. She stated that the pain medication eases her pain somewhat, but the pain is excruciating and the medicine only helps a little.  (Tr. 66-67).  She testified that she still has to lie down if she takes the medication, but is able to rest for five minutes less than without it. (Tr. 67-68).

    C.   <u>Vocational Expert Testimony</u>

A vocational expert, Karen Harrison, testified that plaintiff's past relevant job as a certified nursing assistant is medium and semi-skilled, while her job as a fast food worker is light and unskilled.  The ALJ posed a hypothetical of a person with plaintiff's age, education and work experience who can do sedentary work, except that she can stand and/or walk for two hours and sit for six hours in an eight-hour day; cannot climb ladders, ropes or scaffolds; cannot kneel, crouch or crawl; can occasionally climb ramps and stairs, balance and stoop; cannot reach over shoulder level with her right, non-dominant arm; and must avoid concentrated exposure to pulmonary irritants.  Harrison testified that such an individual could not perform plaintiff's past relevant work.  She stated that the person could perform other sedentary, unskilled jobs such as assembler, production worker helper and inspector.  (Tr. 63-64).

The ALJ modified the hypothetical to add a limitation of frequent, rather than constant, ability to do handling and fingering.  Harrison stated that the jobs she had

named all required frequent handling, so this limitation would not change her answer. (Tr. 64-65).

The ALJ posed a third hypothetical with the added limitation that the claimant has to be off-task for 25 percent of an eight-hour day because she has to lie down for at least one-fourth of the work day.  The vocational expert testified that such an individual could not perform any work.  (Tr. 68).

Plaintiff's attorney posed a hypothetical of a person who can sit for two hours, walk for one hour and stand for one hour in an eight-hour work day, lift less than ten pounds occasionally and never bend, kneel, squat or climb steps or ladders.  Harrison testified that no work exists that this person could do.  (Tr. 68-69).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 15, 17-20).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ applied appropriate legal standards to weigh and resolve conflicts in the medical opinions when assessing plaintiff's residual functional capacity.

At the fourth step of the sequential evaluation, the ALJ found that Hodges has the residual functional capacity to perform sedentary work except that she can stand and/or

15

walk for two hours and sit for six hours in an eight-hour day; cannot climb ladders, ropes or scaffolds, or kneel, crouch or crawl; can occasionally climb ramps or stairs, balance and stoop; cannot reach above shoulder level with her right, non-dominant arm; and must avoid concentrated exposure to pulmonary irritants.  (Tr. 16).  Based on this residual functional capacity, the ALJ found that Hodges cannot perform her past relevant work, but he held at the fifth step of the analysis that jobs are available that she can perform.

Hodges argues that the ALJ erred by granting what she calls "controlling weight," although the ALJ actually said "great weight" (Tr. 21), to the opinions of Mark M. Walker, M.D., a non-examining physician who reviewed her medical records and completed a functional capacity evaluation on November 14, 2012.  She contends that the ALJ erred by assigning "little weight" to the opinions of her treating rheumatologist, Carl M. Gauthier, Jr., M.D., rendered on a "Physical Capacity Evaluation" form dated January 10, 2013, and that Dr. Gauthier's opinions should have been afforded controlling weight or, if not, at least great weight.  She argues that the ALJ erred by failing to analyze specifically the six factors listed in 20 C.F.R. § 404.1527(c)[8] when he decided not to afford controlling weight to Dr. Gauthier's opinions.

---

[8]These factors are (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.  Newton, 209 F.3d at 456.

Plaintiff also contends that, while the ALJ stated that he accorded "great weight" to the opinions of Sandra B. Durdin, Ph.D., a consultative psychologist, he failed to incorporate in his assessment of plaintiff's residual functional capacity Dr. Durdin's opinions that Hodges has only a fair ability to sustain effort, persist at a normal pace and tolerate the stress and pressure of a 40-hour work week.  Dr. Durdin examined Hodges on October 15, 2012, and diagnosed anxiety disorder, not otherwise specified.  She opined that Hodges is <u>not</u> significantly impaired in her ability to understand, remember and carry out simple or familiar, detailed instructions; maintain attention to perform simple, repetitive tasks for two-hour blocks of time; or relate to supervisors and co-workers.  (Tr. 331).  Dr. Durdin also opined that Hodges has a "fair" ability to sustain effort and persist at a normal pace during a 40-hour work week, and to tolerate the stress and pressure of day-to-day work activity.

Psychologist Kelly Ray, Ph.D., reviewed the medical records on November 27, 2012, and found that plaintiff's anxiety is not a severe impairment (Tr. 77-78, 348), an opinion to which the ALJ also afforded great weight.  (Tr. 21).  The ALJ did not mention or incorporate Dr. Durdin's opinion regarding plaintiff's fair abilities when he found that her anxiety is a nonsevere impairment and assessed her residual functional capacity to perform work with no restrictions based on psychological symptoms.

Dr. Walker reviewed plaintiff's medical records on November 14, 2012, and determined that she has the residual functional capacity for light work (Tr. 79-80) with

17

the same limitations that the ALJ assessed, although the ALJ added a restriction on plaintiff's ability to reach overhead with her right arm.  Hodges argues that the ALJ should not have afforded controlling weight to Dr. Walker's opinions because he did not examine her, he did not have the later medical records and his Social Security specialty code is 01, indicating that he is an anesthesiologist (Tr. 80),[9] which she asserts decreases the weight of his opinion compared to that of her treating rheumatologist.  As to the specialty issue, a Case Analysis form indicates that Dr. Walker's area of specialty is "Respiratory."  (Tr. 347).  His specialty therefore appears to be at least relevant to plaintiff's pulmonary symptoms, findings and diagnoses.  She has cited no authority that the reviewing doctor must have the same specialty as the treating specialist in order to render an opinion worthy of significant weight.

As to plaintiff's arguments that Dr. Walker's opinion should have less weight because he did not examine her and did not review the later medical records, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i).  "Although ALJs 'are not bound by any findings made by State agency medical or psychological consultants,' they must consider such findings as opinion evidence."  Alejandro v.

---

[9]The specialty codes are listed in the Commissioner's Program Operations Manual System at DI 24501.004 Medical Specialty Codes, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

Barnhart, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quoting 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); accord Butler v. Barnhart, 99 F. App'x 559, 560 (5th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  It is well established that the ALJ may rely on the non-examining medical expert's function-by-function analysis of the impact of claimant's impairments on her ability to perform various tasks.  Beck v. Barnhart, 205 F. App'x 207, 213-14 (5th Cir. 2006) (citing Onishea v. Barnhart, 116 F. App'x 1, 2 (5th Cir. 2004); Myers v. Apfel, 238 F.3d 617, 620-21 (5th Cir. 2001); SSR 96-8p, 1996 WL 374184); accord Weatherspoon v. Astrue, No. 12-2998, 2013 WL 5507293, at *5 (E.D. La. Sept. 30, 2013) (citing Onishea, 116 F. App'x at 2).

Plaintiff acknowledges these principles, but argues that her rheumatologist's opinions are entitled to more weight than those of a non-examining doctor as a matter of law.  Dr. Gauthier completed a Physical Capacity Evaluation checklist form on January 10, 2013.  He opined that Hodges has extreme limitations in her functional abilities, including the inability to stand and/or walk for more than one hour in an eight-hour work day, sit for more than two hours, lift more than ten pounds and use her hands for repetitive grasping, handling, pushing, pulling and fine manipulation and fingering. Dr. Gauthier found that plaintiff is extremely limited in her ability to perform work activity within a schedule, maintain regular attendance, be punctual within customary tolerance, complete a normal work day or week without interruption from medically based symptoms and perform at a consistent pace without an unreasonable number or

length of rest periods.  He opined that she can tolerate only occasional stress.  (Tr. 350-52).  Hodges argues specifically that the ALJ should have accepted Dr. Gauthier's opinions that she can sit for less than two hours and is extremely limited in her ability to maintain attendance and punctuality, complete a normal work week and perform at a consistent pace.  She contends that Dr. Durdin's opinions that she has only a fair ability to sustain effort, persist at a normal pace and tolerate the stress of work are consistent with Dr. Gauthier's opinions and that she is disabled based on these limitations.

Generally,

[t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment <u>will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence</u>.  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.

Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive.  <u>The opinions may be assigned little or no weight when good cause is shown</u>.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

<u>Newton</u>, 209 F.3d at 455-56 (quotations and citations omitted) (emphasis added).

20

It is true that the record contains medical evidence generated during the eight months <u>after</u> Dr. Walker completed his analysis on November 14, 2012. However, Dr. Gauthier's checklist form Physical Capacity Evaluation, which Hodges argues should have been afforded controlling weight, is dated January 10, 2013, <u>only two months</u> after Dr. Walker's assessment, and Dr. Gauthier saw Hodges <u>only once</u> between those two dates, on December 4, 2012. (Tr. 386). On that date, he noted her complaints of increased abdominal pain and arthralgia[10] and a new complaint of cramps in her hands and feet, but his physical examination findings and diagnoses were essentially the same as at her prior visit on August 4, 2012. (Tr. 317). On January 10, 2013, the same day that Dr. Gauthier filled out the Physical Capacity Evaluation checklist form, his treatment notes record plaintiff's subjective complaints of joint pain with minimal lifting and pain with standing, walking or sitting for more than one hour. On physical examination, Dr. Gauthier noted plaintiff's pain with lumbar flexion and extension and bilateral shoulder abduction and straightening of her normal cervical and lumbar lordosis,[11] which is the first time such a finding was made by any health care provider. (Tr. 384). Only three months earlier, on October 18, 2012, plaintiff's primary care provider, Nurse Practitioner

---

[10]Arthralgia is "pain in one or more joints." <u>MedlinePlus Medical Dictionary</u>, http://www.merriam-webster.com/medlineplus/arthralgia.

[11]Lordosis is "the normal, anteriorly convex curvature of the lumbar [or cervical] segment of the vertebral column." <u>Stedmans Medical Dictionary</u>, avail. on Westlaw at STEDMANS 513370; <u>id.</u> at STEDMANS 513330.

McKay noted that her lumbar spine lordosis was intact. (Tr. 358). Dr. Gauthier's other findings on physical examination on January 10, 2013, were essentially normal. (Tr. 384).

Hodges has not identified any additional credible evidence that is inconsistent with Dr. Walker's analysis. The ALJ expressly stated that he considered all of the evidence, including the later-created medical evidence. The court assumes that the ALJ's statement is accurate. Brunson v. Astrue, 387 F. App'x 459, 461 (5th Cir. 2010); Hammond v. Barnhart, 124 F. App'x 847, 851 (5th Cir. 2005). The ALJ found that Dr. Walker's opinion was supported by the treatment notes of plaintiff's treating physicians and was consistent with the record as a whole, while the evidence as a whole did not support the extreme limitations that Dr. Gauthier assessed.

Substantial evidence supports the ALJ's reasons for giving little weight to Dr. Gauthier's medical source statement dated January 10, 2013. First, appellate courts, including the Fifth Circuit, have often held that checklist form opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records. See Foster v. Astrue, 410 F. App'x 831, 833 (5th Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony. . . . [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, [the treating physician's] opinion is given little weight.'"); Peck v. Barnhart, 214 F. App'x 730, 738

(10th Cir. 2006) (The ALJ provided legitimate reasons for rejecting a doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" nor justified by the doctor's treatment notes.); Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value"); Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was contradicted by evidence in the record); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (quotation omitted) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [When] these so-called reports are unaccompanied by thorough written reports, their reliability is suspect . . . ."); Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987) ("Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence.").

In the instant case, Dr. Gauthier supported his checklist form opinions only by referring to plaintiff's diagnoses of "severe sarcoidosis with arthritis, . . . degenerative disc disease in neck and back . . . , asthma, hypertension, as well as severe anxiety and depression." (Tr. 351). He did not discuss any objective test results or medical records from other treating or examining health care providers. Mere diagnosis of an impairment does not establish a claimant's disability claims. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983));

McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Martin v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)).

Second, as the ALJ explained, Dr. Gauthier's opinions of extreme limitations in plaintiff's ability to sit and to use both hands and arms are not consistent with his own and other providers' treatment notes or objective findings. The inconsistency between the medical records as a whole and the extreme limitations that Dr. Gauthier assessed undermines the credibility and supportability of his opinions.

The medical records contain objective findings on x-ray, MRI, CT scan, ultrasound, biopsy and pulmonary function testing that support plaintiff's diagnoses of sarcoidosis, degenerative disc disease, hyperthyroidism and severe restrictive ventilatory impairment. (Tr. 208-10, 232, 238, 269, 334, 342, 354, 375, 388, 433, 438). However, the treatment notes generally reflect minimal or no findings on physical examination, including normal range of motion in her back and joints (Tr. 226, 229-31, 358, 362, 364, 370, 373, 382-83, 386, 394, 450), even when Hodges sought emergency room treatment. (Tr. 273, 285).

As to her musculoskeletal complaints, Dr. Gauthier himself observed no digital clubbing, digital cyanosis, peripheral edema, joint swelling, deformity or decreased range of motion when he examined Hodges on May 7, May 30, July 9, August 4, and December 6, 2012.  (Tr. 229, 317, 321-22, 386).  Plaintiff's most significant, ongoing physical finding was pitting edema[12] in her feet and legs that began in early 2013, after she had been on long-term treatment with prednisone, a steroid,[13] for her sarcoidosis. Her edema improved when Dr. Gauthier adjusted her prednisone dosage on May 1, 2013. (Tr. 380).

During a hospitalization from May 6 through 10, 2012, for intractable abdominal pain, plaintiff's pain was "well controlled" with medication therapy and she "improved significantly."  (Tr. 223, 225).  She was discharged in stable condition with a diagnosis of suspected sarcoidosis and no restrictions on her activities.  (Tr. 223-24).  Sarcoidosis was later confirmed by the results of a biopsy done while she was in the hospital.  At a followup visit to Dr. Gauthier on May 30, 2012, Hodges had no complaints and reported her pain as zero on a scale of zero to ten.  (Tr. 322).  When she went to a hospital

---

[12]"Edema is swelling of soft tissues due to increased interstitial fluid. . . . [Pitting is] visible and palpable depressions caused by pressure from the examiner's fingers on the edematous area, which displaces the interstitial fluid."  Merck Manual (rev. Aug. 2014 by Lyall A.J. Higginson, M.D.), http://www.merckmanuals.com/professional/cardiovascular-disorders/symptoms-of-cardiovascular-di sorders/edema (visited Sept. 25, 2015).

[13]"Prednisone is used to reduce swelling and improve symptoms associated with certain allergic, skin, stomach, intestinal, blood, eye, kidney, lung, or joint disorders; rheumatoid arthritis; certain cancers; and certain infections.  Prednisone may also be used to treat other conditions . . . ."  PDRhealth (PDR Network, LLC 2015), http://www.pdrhealth.com/drugs/prednisone (visited Sept. 29, 2015).

emergency room on July 4, 2012, complaining of suddenly increased pain in her legs, her pain was reduced from ten out of ten to one out of ten by an injection of Demerol.[14]  The emergency room doctor gave Hodges a prescription for 15 tablets of Lortab[15] every four to six hours as needed for pain and instructed her to follow up with Dr. Gauthier.  (Tr. 270-73).

Five days later, Dr. Gauthier prescribed Mobic,[16] a nonsteroidal anti-inflammatory drug, for pain.  (Tr. 321).  On August 4, 2012, he continued Mobic and added Lortab because plaintiff's lower back pain was refractory to nonsteroidal anti-inflammatories.  He observed that plaintiff's sarcoidosis was stable, needing only monitoring of her long-term medication use.  (Tr. 317).  Hodges told Nurse Practitioner McKay on October 18, 2012, that Mobic relieved her knee, but not her back, pain.  At this visit, Hodges reported numbness and tingling in her left arm and hand for the first time in the medical records.  (Tr. 356-58).  On November 6, 2012, when she presented for an MRI, Hodges reported no weakness, numbness or problems with her arms.  (Tr. 339).  Hodges did not see Dr.

---

[14]Demerol injection (generic name:  meperidine) "is a narcotic painkiller used for the relief of moderate to severe pain, as well as for use before and during surgery."   PDRHealth, http://www.pdrhealth.com/drugs/demerol-injection (visited Sept. 30, 2015).

[15]Lortab (generic name:  hydrocodone) "is a combination of acetaminophen (Tylenol) and the opioid pain medication hydrocodone, used to treat moderate to moderately severe pain."  PDRhealth, http://www.pdrhealth.com/drugs/lortab (visited Sept. 29, 2015).

[16]Mobic (generic name: meloxicam) "is a nonsteroidal anti-inflammatory drug (NSAID) used to treat osteoarthritis, rheumatoid arthritis in adults, and juvenile rheumatoid arthritis."   Id., http://www.pdrhealth.com/drugs/mobic (visited Sept. 29, 2015).

Gauthier again until December 4, 2012, when he prescribed Lortab for her complaints of recently increased abdominal pain, arthralgia and cramps in her hands and feet. (Tr. 386). She complained of difficulty with her left hand grip at a visit to NOLA Urgent Care on July 4, 2013. (Tr. 473).

Plaintiff's back pain improved significantly when she had physical therapy in November and December 2012, but she was not compliant with her physical therapy schedule or home exercise program and she was discharged. (Tr. 477). Her treatment records state on multiple occasions that she was noncompliant with her blood pressure medications and with instructions to have laboratory tests done. (Tr. 212, 215, 368, 370, 372-73, 383). Her hypertension was controlled when she complied with her medication regimen. (Tr. 452).

Despite the finding of severe restrictive ventilatory impairment on pulmonary function testing, the evidence indicates that plaintiff's asthma has been under control during the relevant time period. She had repeated findings on physical examination of a chest clear to auscultation without wheezes, rales, rhonchi or accessory muscle use, and with good air exchange bilaterally (Tr. 215, 226, 289, 317, 326, 358, 370, 394, 450), and no emergency room visits or hospitalization for complaints of asthma. Hodges also did not comply with regular reminders from her health care providers to exercise and change her diet. Although she failed to take her thyroid medication as prescribed, her thyroid-stimulating hormone level had improved without medication as of January 31, 2013. (Tr.

27

449, 452).  A claimant's lack of need for strong medication or failure to seek or comply with treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Clayborne v. Astrue, 260 F. App'x 735, 737 (5th Cir. 2008); Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)); Austin v. Apfel,  205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)).

The objective testing reveals minimal degenerative changes in plaintiff's thoracic and cervical spine (Tr. 208, 243, 354, 375) and, as the ALJ found, only mild to moderate degenerative changes in her lumbar spine.  (Tr. 241, 269, 342).  Hodges argues that she actually has severe degenerative changes at L5-S1, based on the "Findings" portion of an MRI report dated November 6, 2012, which states that the L5-S1 level demonstrates "moderate severe foraminal narrowing."  (Tr. 342) (emphasis added).  Because this statement is grammatically incorrect, it is unclear whether the interpreting physician meant to say "moderately severe" or "moderate to severe" or something else.  However, the "Impression" portion of the same report states that the L5-S1 level shows "moderate foraminal narrowing."  Id. (emphasis added).  The ALJ's opinion recites verbatim the

stated Impression (Tr. 18), which is a substantially supported resolution of the conflict and ambiguity in this evidence.

Dr. Gauthier's notation on his checklist form Physical Capacity Evaluation that plaintiff suffers from "severe anxiety and depression" (Tr. 351) is not supported by the records of those who treated and examined her for mental health issues.  It is also <u>not</u> supported by the actions of Dr. Gauthier himself, who did <u>not</u> treat Hodges for anxiety or depression.  This is an additional reason supporting the ALJ's grant of little weight to his opinions.

First, there is no evidence that Hodges was ever diagnosed with depression.  To the extent that Dr. Gauthier was making that diagnosis for the first time, it is unsupported by any treatment notes or clinical findings.

Second, plaintiff's anxiety was not severe enough for her to seek treatment from a mental health provider.  Instead, Nurse Practitioner McKay prescribed anxiety medication for her.  Pavan Chava, D.O., who treated plaintiff's hyperthyroidism, noted on October 8, 2012, that she had rare palpitations and no increased anxiety.  (Tr. 325).  Hodges reported no anxiety or depression to McKay on October 18, 2012.  (Tr. 357).  She reported increased anxiety on December 11, 2012, which McKay described as moderate.  (Tr. 360).  Her palpitations resolved by January 31, 2013.  (Tr. 449).

Based on the opinions of Drs. Durdin and Ray, the ALJ found that plaintiff's anxiety was a non-severe impairment.  (Tr. 15).  Dr. Durdin, who examined Hodges and

29

diagnosed anxiety disorder, opined that plaintiff's anxiety did not impair her ability to carry out simple or familiar, detailed instructions; to maintain attention to perform simple, repetitive tasks for two-hour blocks of time; or to relate to supervisors and co-workers.  Dr. Durdin reported that Hodges has a fair ability to persist at a normal pace and tolerate the stress of a 40-hour work week.  Although Dr. Durdin did not define "fair," the dictionary definition is "neither excellent nor poor; moderately or tolerably good."[17]  A fair ability is certainly less severe than the "extreme" limitation that Dr. Gauthier posited.  The ALJ's failure to mention a particular piece of evidence, such as Dr. Durdin's rating of plaintiff's fair abilities, does not necessarily mean that he failed to consider it, and the ALJ's decision states explicitly that he considered the entire record in his decision.  Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011); Hammond v. Barnhart, 124 F. App'x 847, 851 (5th Cir. 2005).

Hodges argues that the ALJ erred by affording "controlling weight" to Dr. Walker's opinions.  This is factually incorrect. "Controlling" is the term used in the Commissioner's regulations "to describe the weight we give to a medical opinion from a treating source that must be adopted."  SSR 96-2P, 1996 WL 374188, at *2 (July 2, 1996) (emphasis added).  "Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating

---

[17] Dictionary.com Unabridged (Random House, Inc.), http://dictionary.reference.com/browse/fair (visited Sept. 30, 2015).

source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to 'controlling weight.'"  Id. (emphasis added).  In the instant case, the ALJ's findings are clear that he gave "great," not "controlling" weight, to Dr. Walker's opinion.

Hodges also argues that this case violates Newton in that the ALJ summarily rejected Dr. Gauthier's opinions and relied entirely on a non-examining physician's opinions.  The Fifth Circuit held in Newton that, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  Newton, 209 F.3d at 453.

Plaintiff's argument is again factually incorrect.  The ALJ based his residual functional capacity assessment on both Dr. Walker's evaluation and the ALJ's own review of the entire record.  As the summary of the medical records above indicates, this is a case, unlike Newton, in which "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another."  Newton, 209 F.3d at 458.  Dr. Walker's opinions were based on first-hand medical evidence from plaintiff's treating physicians and were consistent with both the prior and subsequent medical evidence, while Dr. Gauthier's checklist form Physical Capacity Evaluation was conclusory, based largely on plaintiff's self-reported symptoms

on the day of the evaluation and inconsistent with the remainder of the medical records in numerous respects.

Dr. Durdin's opinions were based on her examination of Hodges. "When multiple physicians have examined a claimant, the ALJ may properly rely on a non-examining physician's assessment that is supported by medical findings by one of the examining physicians." Cline v. Astrue, 577 F. Supp. 2d 835, 845 (N.D. Tex. 2008) (citing Johnson v. Apfel, 234 F.3d 705, 2000 WL 1598004, at *1 (5th Cir. 2000)); see also Villa v. Sullivan, 895 F.2d 1019, 1023-24 (5th Cir. 1990) (citing Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Johnson v. Harris, 612 F.2d 993, 996-98 (5th Cir. 1980); Strickland v. Harris, 615 F.2d 1103, 1109-10 (5th Cir. 1980)) (rejecting argument that "reports of non-examining physicians do not provide substantial evidence as a matter of law. While that may be true when the reports of non-examining physicians constitute the sole medical evidence presented, or when a non-examining physician makes specific medical conclusions that either contradict or are unsupported by findings made by an examining physician, this case presents neither of those situations.").

The ALJ may, and in this case did, have good cause to reject a treating physician's opinion when it was inconsistent with and unsupported by the medical treatment evidence, including that doctor's own notes, even if there is no directly conflicting opinion from another physician. Luckey v Astrue, 458 F. App'x 322, 325 (5th Cir. 2011). Thus, "this is not a case of a non-examining physician's testimony alone

trumping a treating physician's. . . .  [Dr. Walker's] evaluation of the medical record merely adds strength to [the first-hand evidence] by having it confirmed by an outside physician who reviewed the medical records."  Rollins v. Astrue, 464 F. App'x 353, 356 n.4.

Hodges argues that, pursuant to Newton, the ALJ must expressly consider the six factors in 20 C.F.R. § 404.1527 whenever the ALJ discounts a treating physician's opinion.  This argument is unpersuasive.  Newton held that the ALJ must consider the six factors only when the ALJ declined "to give any weight to the opinions of the claimant's treating specialist."  Newton, 209 F.3d at 456 (emphasis added).  The ALJ in the instant case gave "little weight" to the opinions in Dr. Gauthier's checklist form, but otherwise accepted much of Dr. Gauthier's opinions contained in his treatment notes.

As he is entitled to do, the ALJ resolved conflicts in the evidence in favor of the opinions of Drs. Walker, Durdin and Ray.  Escalante v. Astrue, 286 F. App'x 179, 180 (5th Cir. 2008) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).  Accordingly, this assignment of error lacks merit.

> ### 2. Substantial evidence supports the ALJ's finding that Hodges does not have significant limitations in both of her hands and arms.

Hodges argues that the ALJ erred by failing to include in her residual functional capacity problems with using her hands and arms bilaterally, not just as to overhead

reaching with her right, non-dominant arm, as the ALJ found.  She relies again on Dr. Gauthier's Physical Capacity Evaluation checklist form dated January 10, 2013, in which he opines that Hodges cannot use her hands for repetitive grasping, handling, pushing, pulling and fine manipulation and fingering.  (Tr. 351).  Substantial evidence supports the ALJ's decision to afford little weight to Dr. Gauthier's opinion in this regard.

The treatment notes contain few reports of limitations in plaintiff's arms and hands.  She denied any neuropathy[18] to Dr. Gauthier on May 7, 2012.  (Tr. 228).  On October 18, 2012, ten months after her alleged onset date, Hodges reported numbness and tingling in her left arm and hand for the first time.  (Tr. 356-58).  On November 6, 2012, she reported no weakness, numbness or problems with her arms.  (Tr. 339).  She made a new complaint of cramps in her hands to Dr. Gauthier on December 4, 2012 (Tr. 386), but that symptom was not noted on January 10, 2013.  (Tr. 384).  Finally, she complained of difficulty with her left hand grip on July 4, 2013, seven months after Dr. Gauthier's Physical Capacity Evaluation.  (Tr. 473).

In addition, Hodges testified that reaching above her shoulder was a problem with her right hand, but that she can button her blouse, pull up zippers and turn doorknobs.

---

[18]     Peripheral neuropathy is dysfunction of one or more peripheral nerves (the part of a nerve distal to the root and plexus).  It includes numerous syndromes characterized by varying degrees of sensory disturbances, pain, muscle weakness and atrophy, diminished deep tendon reflexes, and vasomotor symptoms, alone or in any combination.
The Merck Manual (rev. Mar. 2014 by Michael Rubin, MDCM), http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/peripheral-neuropathy (visited Oct. 1, 2015).

(Tr. 46, 49).  The ALJ properly considered plaintiff's "daily activities in determining that her impairments were not totally debilitating and did not prevent her from performing significant work activities."  Jones v. Barnhart, 112 F. App'x 996, 2004 WL 2634534, at *1 (5th Cir. Nov. 19, 2004) (citing Leggett, 67 F.3d at 565 n.12; Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987)).  Accordingly, this assignment of error is meritless.

> 3.   Substantial evidence supports the ALJ's credibility finding and residual functional capacity assessment.

Hodges argues that the ALJ cannot ignore her subjective complaints of pain and that the ALJ's "unfavorable credibility evaluation of [her] complaints of pain will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and assigns articulated reasons for discrediting the claimant's subjective complaints of pain." Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988) (citation omitted) (emphasis added).

The ALJ did not ignore plaintiff's complaints of pain.  He incorporated in his residual functional capacity assessment numerous limitations on sitting, standing, walking and other exertional activities.  As the review of the medical evidence in the preceding sections indicates, plaintiff's subjective complaints are not credible because they are not supported by uncontroverted evidence.

> While pain can be disabling, it is not an automatic ground for entitlement to disability benefits.  Pain is recognized as a disabling

> condition under the Act only where it is constant, unremitting, and wholly
> unresponsive to therapeutic treatment.  The test for disability under the Act
> is not satisfied merely because Plaintiff cannot work without some pain or
> discomfort.

Alvarez v. Colvin, No. 3:12-CV-03569-BK, 2013 WL 1858197, at *7 (N.D. Tex. May 3,

2013) (citing Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983)); accord Nugent v.

Astrue, 278 F. App'x 423, 427 (5th Cir. 2008); Beck v. Barnhart, 205 F. App'x 207, 212

(5th Cir. 2006); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Selders, 914

F.2d at 618; Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985).

It is within the ALJ's discretion to determine the disabling nature of a claimant's

pain, and the ALJ's determination is entitled to considerable deference.  Jenkins v.

Astrue, 250 F. App'x 645, 647 (5th Cir. 2007) (citing Chambliss, 269 F.3d at 522).

Whether a claimant is able to work despite some pain is within the province of the ALJ,

and the determination should be upheld if supported by substantial evidence.  Id. (citing

Chambliss, 269 F.3d at 522; Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).

Determining the credibility of plaintiff's subjective evidence of pain and disability

is a necessary part of the ALJ's consideration of the evidence.  Luckey, 458 F. App'x at

326 (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462.

The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints,

but "is not required to 'follow formalistic rules in his articulation.'"  Hernandez v.

Astrue, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  The ALJ

has the responsibility to evaluate the credibility of witnesses, <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" <u>Spruill v. Astrue</u>, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting <u>Falco</u>, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to <u>considerable deference</u> by this court. <u>McKnight v. Astrue</u>, 340 F. App'x 176, 181 (5th Cir. 2009) (citing <u>Newton</u>, 209 F.3d at 459); <u>Bedford v. Astrue</u>, 236 F. App'x 957, 962 (5th Cir. 2007) (citing <u>Newton</u>, 209 F.3d at 459). The ALJ is required only to review the entire record, resolve conflicts in the evidence and state specific reasons for his credibility findings, supported by the evidence. <u>Luckey</u>, 458 F. App'x at 324; <u>Giles v. Astrue</u>, 433 F. App'x 241, 249 (5th Cir. 2011); <u>Newton</u>, 209 F.3d at 452.

The ALJ complied with these requirements in the instant case. He explained why plaintiff's subjective symptoms and alleged limitations were not credible and were inconsistent with the evidence as a whole. He considered plaintiff's testimony, her activities of daily living, and the evidence of medical treatment. His reasons are substantially supported by the evidence. <u>Thibodeaux v. Astrue</u>, 324 F. App'x 440, 443-44 (5th Cir. 2009); <u>Bryan v. Halter</u>, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) <u>Austin v. Apfel</u>, 205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999); <u>Wren v. Sullivan</u>, 925 F.2d 123, 128 (5th Cir. 1991).

The ALJ incorporated into his residual functional capacity assessment all of the functional limitations that he found credible.  Contrary to plaintiff's argument, under established Fifth Circuit law, the ALJ's residual functional capacity determination incorporates a finding that Hodges can sustain work activities on a regular and continuing basis.  Castillo v. Barnhart, 151 F. App'x 334, 335-36 (5th Cir. 2005); Bond v. Astrue, No. 08-4125, 2010 WL 497749, at *8 (E.D. La. Feb. 2, 2010) (citing Bryant v. Astrue, 272 F. App'x 352, 356 (5th Cir. 2008)).  Plaintiff's own testimony, which is not substantially supported by the medical evidence, is insufficient to establish any additional limitations.  Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ used appropriate legal standards and substantial evidence supports the weight he afforded to the opinions of Drs. Gauthier and Walker.  Substantial evidence supports the ALJ's credibility finding and residual functional capacity assessment.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[19]

New Orleans, Louisiana, this ___15th___ day of October, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[19]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

39